**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| HEALTHCARE LIVING FOR FAMILIES, INC., | * |
| Plaintiff, | * |
| v. | * |
| OPTUM, INC. ET AL., | * |
| Defendants. | * |

Civil No. 25-79-BAH

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

**MEMORANDUM OPINION**

Plaintiff Healthcare Living for Families, Inc. ("HCLF") brought suit against Optum, Inc. ("Optum"), United Behavioral Health, Inc. ("United")[1], and the State of Maryland ("Maryland" or "the State") (collectively "Defendants") alleging negligence, breach of fiduciary duty, breach of contract, conversion, tortious interference with contractual rights, and federal civil rights violations. ECF 11.[2] Pending before the Court are the motions to dismiss filed by Optum and United, ECF 4, and by the State, ECF 9. Plaintiff filed oppositions at ECFs 24 and 25, and Defendants filed replies at ECFs 28 and 29. All filings include memoranda of law and both motions include exhibits.[3] The Court has reviewed all relevant filings and finds that no hearing is

---

[1] Plaintiff notes that United does business in Maryland as "Optum Maryland," ECF 11, at 4 ¶ 12, which United also confirms, *see* ECF 4-1, at 10. The Court will refer to the entity as "United" throughout for clarity.

[2] This case was removed from the Circuit Court for Baltimore City and the original state court complaint was first docketed at ECF 1-2. The complaint was later filed separately at ECF 11, which appears out of numerical order on the docket. The Court cites the standalone version of the complaint docketed at ECF 11.

[3] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

necessary. *See* Loc. R. 105.6 (D. Md. 2025). Accordingly, for the reasons stated below, Defendants' motions are **GRANTED**.

## I.    BACKGROUND

Plaintiff HCLF is a healthcare provider servicing individuals and families in the Baltimore area. ECF 11, at 2 ¶ 2. As part of its programming, HCLF provides "comprehensive behavioral health services to vulnerable populations in the Baltimore community" through an outpatient mental health clinic, a psychiatric rehabilitation program, mobile treatment services, and a substance use disorder program. *Id.* at 5 ¶ 14.

Plaintiff notes that "[u]nder its Public Behavioral Health System ["Health System"], Maryland is obligated to reimburse healthcare providers [like HCLF] for services rendered to Medicaid patients." ECF 11, at 5 ¶ 15. Plaintiff alleges that Defendant Optum, which is incorporated under the laws of Delaware, serves as the contracted Administrative Service Organization ("ASO") for the Health System through its affiliate United, which is incorporated under the laws of California and does business in Maryland under the trade name "Optum Maryland." *Id.* ¶¶ 11–12. Along with Optum, Plaintiff alleges, United "shares responsibility in managing behavioral health reimbursements and claims processing[.]" *Id.*

United became the ASO for the Health System in January 2020, despite questions about its qualifications raised during a July 2019 meeting of the Maryland Board of Public Works. ECF 11, at 5 ¶ 16, 6 ¶ 18. During this meeting, Peter Franchot, then Maryland's Comptroller, raised concerns about the entity's "limited experience providing administrative services to state governments." *Id.* at 6 ¶ 18. Nevertheless, United "underbid the incumbent contractor by $72.1 million" and was awarded the ASO contract. *Id.*

Plaintiff further alleges that "Maryland failed to ensure [United's] claims processing system functioned properly before its January 2020 launch." ECF 11, at 6 ¶ 19. Indeed, during

an audit in October 2022, the "Maryland Department of Legislative Services found that Maryland did not adequately scrutinize InfoMC, [United's] key subcontractor responsible for claims processing, despite InfoMC's documented history of failures in other states[.]" *Id.* As a result, "[f]rom the outset of [United's] tenure as the ASO, HCLF experienced significant disruptions in the submission and processing of its claims, resulting in delayed and inaccurate reimbursements by [United]." *Id.* at 7 ¶ 20. Plaintiff pins these issues on technical failures on [United's] "Incendo Provider Portal" ("IPP"). *Id.*

United "acknowledged these technical issues in provider alerts it issued to service providers in early 2020." ECF 11, at 7 ¶ 21. Consequently, Maryland instructed United "to issue 'estimated payments' to healthcare providers," including HCLF, and United agreed to "issue the estimated payments until its system was corrected or restored." *Id.* ¶ 22. To do so, United electronically transmitted the estimated payments on a weekly basis to healthcare providers, including HCLF, who "did not have the ability to reject the estimated payments." *Id.* The Maryland Department of Health determined "the estimated payment amount for most providers based on the average of all weekly payments made during the 2019 calendar year." *Id.* ¶ 23.

Plaintiff contends that despite its "continuous services during the COVID-19 pandemic, United's estimated payments failed to reflect actual claims submitted, leading to substantial financial shortfalls." ECF 11, at 8 ¶ 25. Moreover, "[t]owards the end of 2020, [United] unilaterally began deducting recoupments from HCLF's reimbursements," claiming that these deductions "were necessary to recover amounts from its estimated payments that [United] deemed to be overpayments." *Id.* ¶ 27. Plaintiff did not consent to these deductions, which persisted for more than three years, "extending well beyond the period of the initial estimated payments made by [United]." *Id.* ¶¶ 27–28. United also "failed to provide HCLF with any itemized accounting

3

or documentation that would explain or justify the amounts being recouped and the remaining balance allegedly owed," despite HCLF requesting such information "on multiple occasions." *Id.* ¶ 29. The lack of transparency "has made it impossible for HCLF to verify the accuracy of the recoupments or determine the legitimacy of [United's] claims," leaving HCLF "in a state of financial uncertainty." *Id.* at 9 ¶ 31.

Plaintiff also details United's "systematic" denial of claims submitted for individual psychotherapy services, despite Plaintiff "submitting claims in accordance with proper billing procedures and documentation requirements." ECF 11, at 9 ¶ 32. On February 3, 2022, shortly after the improper denials began, HCLF "contacted [United] to initiate the reconciliation process for the rejected claims." *Id.* ¶ 33. Later that month, following a meeting between United and HCLF, United "acknowledged the need to review and reprocess the rejected claims." *Id.* Thereafter, the Maryland Department of Health "granted approval for the [United] claims team to waive timely filing requirements for claims submitted during the reconciliation period from 2019 through August 8, 2020." *Id.* ¶ 34. However, United still continued to "systematically deny valid claims across all four of HCLF's service programs." *Id.*

For over a year, from March 2022 through May 2023, HCLF "engaged in extensive efforts to resolve the claims processing issues with [United][.]" ECF 11, at 10 ¶ 35. Such efforts included resubmitting claims, meeting with claims representatives, providing examples of improperly denied claims, requesting itemization of alleged overpayments, and seeking clarification on the ongoing claim denials. *Id.* During this time, on September 2, 2022, "HCLF sent a formal letter to [United] requesting payment of $268,250.00 in outstanding claims" and detailing how the non-payment of valid claims "was creating severe financial strain on HCLF's operations." *Id.* ¶ 36. A few months later, HCLF sent another requesting payment "of an increased outstanding balance of

4

$301,541.17, reflecting additional unpaid claims that had accumulated." *Id.* ¶ 37. However, United did not offer any resolution, and, as a result, HCLF "was forced to terminate its Mobile Treatment Services" program. *Id.* ¶¶ 37–38. HCLF suffered other, substantial financial harm in the form of "severe cash flow restrictions affecting its ability to meet payroll and operational expenses, [ ] forced reduction in services offered to patients, and [ ] threatened ability to continue operating as a viable healthcare provider." *Id.* at 11 ¶ 41.

On August 31, 2024, Plaintiff reports that the Central Collection Unit ("CCU") of the Maryland Department of Budget and Management issued a notice of intent to offset future federal vendor payments owed to HCLF in order to "reduce an alleged debt of $154,265.41." ECF 11, at 11 ¶ 42. Two weeks later, HCLF responded and challenged "the intended collection action" as well as "the validity of the alleged debt." *Id.* ¶ 43. Nevertheless, the collection activity continued, with the CCU withholding thousands of dollars in claim reimbursements over the following months. *Id.* at 12–13 ¶¶ 43–50. On November 19, 2024, the CCU informed HCLF that it intended "to certify the alleged debt [ ] to the Comptroller of the Treasury" and that HCLF could request an investigation by writing to the CCU within fifteen days of the notice. *Id.* at 13 ¶ 52. HCLF opted to do so, emailing the Department of Budget and Management with details of discrepancies in the data relied upon by the CCU and following up with a letter objecting to the certification of the alleged debt. *Id.* at 13–14 ¶¶ 53–54.

HCLF states that "[u]pon information and belief, Maryland withheld the vendor payments based on information it received from [United]." ECF 11, at 14 ¶ 57. It construes "Maryland's decision to proceed with aggressive collection actions through the CCU," in the face of its failure "to require [United] to properly document and validate the alleged debts," represents "deliberate indifference" to the rights of providers like HCLF. *Id.* ¶ 55. And HCLF avers that "[United]

5

improperly recouped funds from HCLF's reimbursement claims that [United] was not entitled to recoup," with the recoupments going beyond "the estimated payments period" and involving "improper withholding of reimbursements for legitimate claims submitted by HCLF." *Id.* ¶ 56.

Plaintiff goes on to allege that "[United] has consistently provided preferential treatment to White-owned clinics, approving and reimbursing their claims under similar or identical circumstances where it denied or delayed reimbursements to HCLF and other minority-owned clinics." ECF 11, at 15 ¶ 58. In support of this position, Plaintiff points out two instances where United approved and paid all or nearly all of the reimbursement claims submitted by two addiction treatment facilities owned by white individuals, and also cites United's allegedly more favorable recoupment terms for a "non-minority owned treatment facility." *Id.* at 15–16 ¶¶ 59–60, 62. At the same time, Plaintiff states, another minority-owned rehabilitation center allegedly "faced nearly identical discriminatory treatment by [United]" as did HCLF. *Id.* at 15 ¶ 61. Per Plaintiff, these instances "reinforce[] the conclusion that [United's] conduct was racially motivated." *Id.* at 16 ¶ 61.

Plaintiff brings seven counts: tortious interference with contractual rights in violation of 42 U.S.C. § 1981 against United (count I); negligence against all Defendants (count II); breach of fiduciary duty against United (count III); tortious interference with business relationships against United (count IV); conversion United and the State of Maryland (count V); violations of Title VI of the Civil Rights Act of 1964 against the State of Maryland (count VI); and third-party beneficiary breach of contract claim against United (count VII).

Defendant Optum has moved to dismiss Plaintiff's claims against it for lack of personal jurisdiction, while Defendant United moves to dismiss the complaint for failure to state a claim.

ECF 4-1, at 8. The State of Maryland also moves to dismiss the counts brought against it—counts II, V, and VI—for failure to state a claim. ECF 9-1, at 4.

## II.    **LEGAL STANDARD**

### A.    **12(b)(2)**

"[A] Rule 12(b)(2) challenge raises an issue for the court to resolve, generally as a preliminary matter." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016) (citing *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)). "Under Rule 12(b)(2), a defendant must affirmatively raise a personal jurisdiction challenge, but the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such a challenge." *Id*. "[A] court has broad discretion to determine the procedure that it will follow in resolving a Rule 12(b)(2) motion." *Id.* at 268. "[N]either discovery nor an evidentiary hearing is required in order for the court to resolve a motion under Rule 12(b)(2)." *Jones v. Mut. of Omaha Ins. Co.*, 639 F. Supp. 3d 537, 544 (D. Md. 2022). "When 'the existence of jurisdiction turns on disputed factual questions the court may resolve the [jurisdictional] challenge on the basis of a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question.'" *Id.* (quoting *Combs*, 886 F.2d at 676).

"When personal jurisdiction is addressed under Rule 12(b)(2) without an evidentiary hearing, the party asserting jurisdiction has the burden of establishing a prima facie case of jurisdiction." *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 226 (4th Cir. 2019). "This 'prima facie case' analysis resembles the plausibility inquiry governing motions to dismiss for failure to state a claim under Rule 12(b)(6)." *Id.* "The court must determine whether the facts proffered by the party asserting jurisdiction—assuming they are true—make out a case of personal jurisdiction over the party challenging jurisdiction." *Aerotek Inc. v. Babcock & Wilcox Solar Energy, Inc.*, Civ. No. 24-177-JRR, 2024 WL 4792116, at *2 (D. Md. Nov. 14, 2014) (citing *Sneha*

7

*Media & Ent., LLC v. Associated Broad. Co. P Ltd.*, 911 F.3d 192, 196–97 (4th Cir. 2018)). In

resolving a motion brought pursuant to Rule 12(b)(2), "a court may look beyond the complaint to

affidavits and exhibits in order to assure itself of personal jurisdiction." *UMG Recordings, Inc. v.

Kurbanov*, 963 F.3d 344, 350 (4th Cir. 2020) (citing *Grayson v. Anderson*, 816 F.3d 262, 267 (4th

Cir. 2016)).

**B.    12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim

upon which relief can be granted." In considering a motion under this rule, courts discount legal

conclusions stated in the complaint and "accept as true all of the factual allegations contained in

the complaint." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009). A court then draws all reasonable inferences in favor of the plaintiff and

considers whether the complaint states a plausible claim for relief on its face. *Nemet Chevrolet,

Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"The complaint must offer 'more than labels and conclusions' or 'a formulaic recitation of

the elements of a cause of action[.]'" *Swaso v. Onslow Cnty. Bd. of Educ.,* 698 F. App'x 745, 747

(4th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). At the same time,

a "complaint will not be dismissed as long as [it] provides sufficient detail about [the plaintiff's]

claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits."

*Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014).

## III.  ANALYSIS

### A.    Claims Against Optum

Defendant Optum argues that the claims against it should be dismissed for lack of personal jurisdiction. ECF 4-1, at 12. Optum contends that it is neither "at home" in Maryland and so is not subject to this Court's general jurisdiction nor has it "purposefully directed its activities" to the state such that it is subject to specific jurisdiction." *Id.* at 13.

"General jurisdiction may be exercised when the defendant has contacts with the forum jurisdiction that are 'so constant and pervasive as to render it essentially at home in the forum State.'" *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 131–32 (4th Cir. 2020) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014)). The "paradigm forum" where a corporation may be fairly regarded as "at home" is the forum in which it is incorporated and has its principal place of business. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). Optum argues that the complaint fails to plead facts showing that Optum is "at home" in Maryland in this respect, *see* ECF 4-1, at 13, a point which Plaintiff concedes, *see* ECF 24, at 13. The Court therefore confines its analysis to whether it may exercise specific jurisdiction over Optum.

In order for "a district court to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) (internal citations omitted). Courts have determined that Maryland's long-arm statute is coextensive with the due process clause of the Fourteenth Amendment and so the two prongs of the test may be considered in tandem. *Id.* at 396–97. "Thus, [the] statutory inquiry merges with [the] constitutional inquiry." *Id.*

9

Maryland's long-arm statute is codified at Md. Code Ann., Cts. & Jud. Proc. ("CJP") § 6-103(b). Section 6-103(b)(1) "authorizes jurisdiction over a party who directly or by an agent . . . [t]ransacts any business or performs any character of work or service in the State." "Maryland courts have construed the phrase 'transacting business' narrowly, requiring, for example, significant negotiations or intentional advertising and selling in the forum state." *Cranford v. Tenn. Steel Haulers, Inc.*, Civ. No. ELH-17-2768, 2018 WL 3496428, at *5 (D. Md. July 20, 2018) (quoting *Aphena Pharma Sols.-Md. LLC v. BioZone Lab'ys, Inc.*, 912 F. Supp. 2d 309, 315 (D. Md. 2012)). "Courts generally hold that business practices only tenuously connected to the cause of action are not enough to confer specific jurisdiction." *Phillips v. Brit. Airways*, Civ. No. DLB-23-3066, 2024 WL 3690786 (D. Md. Aug. 5, 2024) (citing *Aphena*, 912 F. Supp. 2d at 316). Section 6-103(b)(2), meanwhile, authorizes a court's exercise of personal jurisdiction over a party that "contracts to supply goods, food, services, or manufactured products in the state."

In support of its argument that personal jurisdiction is lacking, Optum provides a declaration from Optum Director Christina Thompson. *See* ECF 4-2. Thompson explains that Optum and UBH are "affiliated companies under the ultimate parent company UnitedHealth Group but are separate and distinct corporate entities." *Id.* at 2 ¶ 7. She also states that Optum was not and is not a party to the Administrative Services Contract nor did it ever "process, approve, or deny claims submitted by behavioral health providers to Maryland's Medicaid program." *Id.* In its response, Plaintiff does not acknowledge this declaration but contends that the complaint sufficiently alleges that Optum "exercises substantial control and supervision over [United]." ECF 24, at 15. The Court disagrees. "When personal jurisdiction is addressed under Rule 12(b)(2) without an evidentiary hearing, the party asserting jurisdiction has the burden of establishing a *prima facie* case of jurisdiction.." *Hawkins*, 935 F.3d at 226. "In deciding whether the plaintiff

has proved a *prima facie* case of personal jurisdiction, the district court must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor." *Mylan Laby's, Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993). Here, however, Plaintiff failed to respond to Optum's affidavit and so does not meet its burden to show that the Court may exercise personal jurisdiction over Optum. *See Choice Pain & Rehab. Ctr., LLC v. Optum, Inc.*, Civ. No. 24-2144-DLB, 2025 WL 948294, at *5 (D. Md. Mar. 28, 2025) (determining the same in a case involving putative claims against Optum). Accordingly, the claims against Optum are dismissed.

### B. Claims Against United

#### 1. 42 U.S.C. § 1981

42 U.S.C. § 1981 prohibits racial discrimination in making and enforcing of contracts. *See Spriggs v. Diamond Auto Glass*, 165 F.3d 1015, 1017–18 (4th Cir. 1999). To survive a motion to dismiss, a section 1981 claim must allege:

> (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.).

*Greene v. YRC, Inc.*, 987 F. Supp. 2d 644, 656 (D. Md. 2013) (quoting *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993)). "A plaintiff must also show that the interference with a contractual interest would not have happened but for the plaintiff's race." *Nadendla v. WakeMed*, 24 F.4th 299, 305 (4th Cir. 2022) (citing *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020)).

Plaintiff has provided sufficient facts to satisfy the first prong of the above test, as it has adequately alleged that HCLF is minority-owned. ECF 11, at 3 ¶ 10. An allegation that an entity is "entirely owned . . . by a protected minority group" is sufficient to "establish an imputed racial identity, which confers standing to assert a racial discrimination claim under [section] 1981."

*Woods v. City of Greensboro*, 855 F.3d 639, 646 (4th Cir. 2017). However, it fails to satisfy the second prong. HCLF has not alleged facts that would allow the Court to draw a reasonable inference that United discriminated against HCLF because of the race of HCLF's owners. HCLF does state that one other minority-owned clinic faced "nearly identical discriminatory treatment" while some white-owned clinics were treated more favorably, and therefore concludes Optum acted discriminatorily. ECF 11, at 15–16 ¶¶ 59–62. However, HCLF "provides no details about any of these conclusory allegations." *Nadendla*, 24 F.4th at 305. HCLF does not even allege that United was aware of the race of HCLF's owners. Thus, HCLF is unable to show that but for the race of its owners, United would not have interfered with the contractual arrangements. *See Kiver v. Fed. Bus. Couns., Inc.*, Civ. No. 23-3398-BAH, 2024 WL 3424059, at *7 (D. Md. July 16, 2024) (collecting cases where plaintiffs failed to allege discrimination when they failed to plead that the defendant was aware of their membership in a protected class). Contrary to Plaintiff's assertions, it must actually make such an allegation at the pleading stage. *See Comcast*, 589 U.S. at 341 ("[A] plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right."). Without sufficient facts to support its conclusion of discrimination, HCLF cannot sustain its section 1981 claim.

### 2.    Negligence

"Under Maryland law, a plaintiff must establish four elements to prove negligence: (1) a duty owed by the defendant; (2) breach of that duty by the defendant; (3) 'a legally cognizable causal relationship between the breach of duty and the harm suffered;' and (4) damages." *McKinney v. Fulton Bank*, 776 F. Supp. 2d 97, 105 (D. Md. 2010) (quoting *Jacques*, 515 A.2d at 758). "Whether a legal duty exists between parties is a question of law." *H&M Co., Inc. v. Technical Heat Transfer Servs., Inc.*, Civ. No. TDC-14-1518, 2015 WL 1472000, at *5 (D. Md. Mar. 30, 2015).

Moreover, in situations such as the one at issue "where the failure to exercise due care creates a risk of economic loss only, [Maryland] courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability." *Jacques v. First Nat. Bank of Maryland*, 515 A.2d 756, 759 (Md. 1986). "This intimate nexus is satisfied by contractual privity or its equivalent." *Id.* Where contractual privity is not at issue, courts consider whether

> (1) the alleged tortfeasor was aware that its work was to be used for a particular purpose; (2) there was a known party that was intended to reply upon that work; and (3) there was some conduct on the part of the alleged tortfeasor linking it to the party showing that it understood that party's reliance upon its work.

*H&M Co., Inc. v. Technical Heat Transfer Servs., Inc.*, Civ. No. TDC-14-1518, 2015 WL 1472000, at *5 (D. Md. Mar. 30, 2015) (internal citations omitted). In other words, courts look to "the closeness of the relationship between the parties—especially one party's reliance on the other party's due exercise of care—when determining whether there is an intimate nexus that would support finding a duty of care." *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 155 A.3d 445, 456 (Md. 2017). By contrast, no intimate nexus exists where a plaintiff belongs to an "indeterminate" class of persons. *Walpert, Smullian & Blumenthal, P.A. v. Katz*, 762 A.2d 582, 596 (Md. 2000). "Stated differently, the reason for the requirement [of an intimate nexus] is to limit the defendant's risk exposure to an actually foreseeable extent," which is practicable where a defendant is familiar with a particular party. *Id.*; *see also 100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 60 A.3d 1, 13 (Md. 2013).

Plaintiff argues that there was an intimate nexus between United and HCLF because "HCLF relied completely on [United's] ability to properly handle reimbursement claims in order to be able to continue servicing patients with opioid addiction problems." ECF 24, at 24. But as United points out, in another case involving negligence claims against United, Judge Boardman found that a similarly situated clinic failed to allege that an intimate nexus existed between itself

and United. *See* ECF 30, at 2 (citing *Choice Pain*, 2025 WL 948294, at *7). Judge Boardman determined that the *Choice Pain* plaintiff had failed to allege how many providers like it existed and thus whether it was part of an "indeterminate class" such that it would not be a "foreseeable" plaintiff. *Id.* This Court finds that the same outcome is warranted here, where HCLF has likely not provided any indication of the nature of the relationship between itself and United, only that United was awarded the ASO claim for the State of Maryland. *See* ECF 11, at 6 ¶ 18. Accordingly, HCLF has not pled facts sufficient for the Court to draw the reasonable inference that there existed a sufficiently close relationship between HCLF and United such that would support finding a duty of care.

### 3.    Breach of fiduciary duty

Maryland recognizes breach of fiduciary duty as "an independent cause of action" where a plaintiff can show "'[1] the existence of a fiduciary relationship; [2] breach of the duty owed by the fiduciary to the beneficiary; and [3] harm to the beneficiary.'" *Plank v. Cherneski*, 231 A.3d 436, 466 (Md. 2020) (quoting *Froelich v. Erkickson*, 96 F. Supp. 2d 507, 526 (D. Md. 2000)). A fiduciary relationship "involves a duty on the part of the fiduciary to act for the benefit of the other party to the relation as to matters within the scope of the relation." *Buxton v. Buxton*, 770 A.2d 152, 164 (Md. 2001) (quoting Scott & Fratcher, *The Law of Trusts*, § 2.5 (4th ed. 1988)). "[F]iduciary relationships can be created by common law, by statute, or by contract." *Plank*, 231 A.3d at 465. "Well-known examples of habitual or categorical fiduciary relationships [include] those between trustees and beneficiaries, agents and principals, directors and corporations, lawyers and clients, and guardians and wards, as well as the relationship among partners." *Id.*

Though it alleges a fiduciary relationship between itself and United, HCLF does not explain if that relationship arises from common law, statute, or contract. Instead, it contends that "[b]y virtue of its role as ASO, [United] was placed in a position of trust and confidence with

14

respect to HCLF's financial and operational wellbeing" and so assumed fiduciary obligations. ECF 11, at 21 ¶ 88–89. The Court determines that this argument insufficiently alleges the existence of a fiduciary relationship. *C.f. Orji v. Citadel Secs., LLC*, Civ. No. 23-2986-LKG, 2025 WL 860178 (D. Md. Mar. 19, 2025) (determining that a plaintiff failed to allege the existence of a fiduciary relationship where the plaintiff argued that such a relationship arose "by voluntary assumption" and generally "by operation of law" where a defendant "assumed de facto control of his account" but failed to explain further how these allegations supported finding a fiduciary relationship). As it is unable to adequately allege the existence of a fiduciary relationship between itself and United, HCLF fails to state a claim for breach of fiduciary duty.

### 4.    Tortious interference with business relations

"Under Maryland law, tortious interference with economic relations requires a claimant to show '(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.'" *First Data Merch. Servs. Corp. v. SecurityMetrics, Inc.*, 672 F. App'x 229, 236 (4th Cir. 2016) (quoting *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 269 (Md. 1994)). The kind of "wrongful or unlawful acts that could form the basis" for a tortious interference claim include "violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." *Berry & Gould, P.A. v. Berry*, 757 A.2d 108, 113 (Md. 2000) (quoting *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 271 (Md. 1994)).

Plaintiff fails to state a claim for tortious interference with its business relations. The complaint alleges no facts that would support a reasonable inference that United committed any

act with the "intent" to "cause damage to the plaintiffs in their lawful business." *First Data*, 672 F. App'x at 236. Plaintiff generally states that United's conduct "was designed to interfere with and disrupt HCLF's business relationships by withholding the reimbursements," ECF 11, at 24 ¶ 98, but this is a conclusory allegation unsupported by other factual assertions. Plaintiff perhaps implies that United acted discriminatorily—and thus maliciously—but as noted above, Plaintiff has failed to adequately allege discriminatory intent, and has further failed to allege any other action that would support a reasonable inference that United made any intentional act calculated to cause damage to HCLF's business, for the unlawful purpose of causing such damage.

### 5.    Conversion

In Maryland, "[c]onversion is an intentional tort, consisting of two elements, a physical act combined with a certain state of mind." *Darcars Motors of Silver Spring, Inc. v. Borzym*, 841 A.2d 828, 835 (Md. 2004). "The physical act can be summarized as any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it." *Id.* (internal citation and quotation omitted). The intent element is evinced by "an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." *Keys v. Chrysler Credit Corp.*, 494 A.2d 200, 208 (Md. 1985). "The defendant may have the requisite intent even though he or she acted in good faith and lacked any consciousness of wrongdoing, as long as there was an intent to exert control over the property." *Darcars*, 841 A.2d at 836. "The general rule is that monies are intangible and, therefore, not subject to a claim for conversion." *Allied Inv. Corp. v. Jasen*, 731 A.2d 957 (Md. 1999) (citations omitted). "An exception exists, however, when a plaintiff can allege that the defendant converted specific segregated or identifiable funds." *Id.* (citations omitted). Courts have recognized a distinction between claims seeking return of discrete, identifiable monies and those asking for a specific amount of money damages. *See, e.g.*, *G&D Furniture Holdings, Inc. v. SunTrust Bank*,

16

Civ. No. 16-2020-TDC, 2016 WL 7441607, at *7 (D. Md. Dec. 22, 2016) (dismissing conversion claim where the plaintiff "asserted the intentional withdrawal of, and failure to return, a specific dollar amount," but not "that the allegedly converted funds were segregated, identifiable, or kept separate in any way").

Here, while HCLF alleges that it is seeking payment for "specific, identifiable sums of money," ECF 11, at 25 ¶ 104, and contends that such funds are "federal vendor payments specifically designated for healthcare providers like HCLF," ECF 24, at 30, it does not adequately allege that these funds were kept in a separate account and not comingled with any other accounts. *See Nash v. Montgomery Cnty.*, Civ. No. 20-1138-GHB, 2021 WL 1222874, at *8 (D. Md. Mar. 31, 2021) (finding a plaintiff failed to state a claim for conversion where the plaintiff failed to allege "any facts suggesting that these funds have been held in a segregated account or otherwise held apart"). Rather, Plaintiff is not seeking "return of the exact funds" but is instead damages for a specific sum of money. *Durm v. Am. Honda Fin. Corp.*, Civ. No. 13-223-WDQ, 2013 WL 6490309, at *6 (D. Md. Dec. 9, 2013). There is a distinction between the two, and only the former can serve as the basis for a conversion claim involving monies.

### 6.    Breach of contract (third party beneficiary)

Maryland law recognizes a third-party beneficiary to a contract only where "the contract was intended for his or her benefit and it clearly appears that the parties intended to recognize him or her as the primary party in interest and as privy to the promise"; "[i]t is not enough that the contract merely operates to an individual's benefit[.]" *CX Reinsurance Co. v. Levitas*, 207 F. Supp. 3d 566, 570 (D. Md. 2016), *aff'd sub nom. CX Reinsurance Co. Ltd. v. Loyal*, 691 F. App'x 130 (4th Cir. 2017) (quoting *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 56 A.3d 170, 212 (Md. 2012)). "In determining whether that standard is met, the court looks to 'the intention of the parties . . . as expressed in the language of the instrument and consideration of the surrounding

17

circumstances[.]'" *WM. T. Burnett Holding LLC v. Berg Bros. Co.*, 175 A.3d 876, 882 (Md. App. 2017) (quoting *CR-RSC Tower*, 56 A.3d at 170).

United has attached to its motion to dismiss a copy of the contract executed between itself and the Maryland Department of Health (the "Contract").[4] The Contract bears no indication that it contemplates healthcare providers like HCLF as third-party beneficiaries of the contract. Rather, the Contract explicitly sets out that its purpose is to ensure provision of medical care for "eligible Maryland Medical Assistance recipients." ECF 4-3, at 2. And though HCLF may have benefitted from the Contract in some way, the Court reiterates that merely "incidental" beneficiaries have "no right against the promisor or the promisee." *120 W. Fayette St., LLLP v. Mayor of Baltimore*, 43 A.3d 355, 368 (Md. 2012). Though Plaintiff attempts to argue that its complaint sufficiently alleges that healthcare providers such as HCLF were intended beneficiaries of the Contract, *see* ECF 24 at 31–32, it fails to ground any of its arguments in the language of the Contract itself. Because the contractual language is the "primary source" for determining intent to confer the benefits of the contract on a third party, HCLF's general assertions, untethered to the Contract itself, fail to show that it was an intended third-party beneficiary of the Contract. The breach of contract claim is therefore dismissed.

---

[4] In evaluating a motion to dismiss, the Court may consider "documents attached to the complaint, 'as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic.'" *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019) (quoting *Philips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)). A document is "integral" when "its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F.Supp.2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis omitted).

### C.    Claims Against Maryland

#### 1.    Negligence

Plaintiff also brings a claim for negligence against Maryland based on the theory that the State owed it a duty to exercise reasonable care in selecting an ASO but failed to do so. ECF 11, at 18–19 ¶¶ 76–77.

As a threshold matter, the parties dispute whether this claim is timely brought under the Maryland Tort Claims Act ("MTCA"). The MTCA waives "the State's sovereign immunity for tortious acts or omissions committed with the scope of the public duties of 'state personnel' and committed without malice or gross negligence." *Barbre v. Pope*, 935 A.2d 699, 709 (Md. 2007). The MTCA requires both that a claimant "submit written notice to the State Treasurer within one year of the injury . . . that is the basis of the claim" and that a claimant file any lawsuit "within 3 years after the cause of action arises." *Peacock v. Debley*, 314 A.3d 439, 447 (Md. App. 2024) (citing Md. Code, State Gov't ("SG") §§ 12-106(b)(1), 12-106(b)(3)). The State contends that most of the alleged conduct underlying the negligence claim—that is, the alleged failure to properly vet or oversee United—occurred, at the latest, in 2020, well outside of the three-year limit by the time HCLF filed suit in state court on December 10, 2024. ECF 9-1, at 13–14. HCLF counters that the alleged conduct "continued well into 2024" and cites specifically the collection actions undertaken by the CCU. ECF 25, at 10–11. In reply, the State argues that the fact that the CCU "later took action to collect on Plaintiff's 2020 debt after years of non-payment—as it was lawfully authorized and indeed required to do under Maryland law—does not restart the limitations window" of the MTCA. ECF 28, at 4–5.

Regardless of the applicability of the three-year limitation, HCLF still fails to state a claim for negligence because it has not adequately alleged the existence of a duty owed. While HCLF contends that Maryland assumed a duty of care as "the operator of Maryland's Public Behavioral

Health System," ECF 11, at 18 ¶ 76, duties owed by a government entity to the public at large are not enforceable by tort actions, absent a special relationship between the entity and the individual or class of individuals in question. *See Muthukumarana v. Montgomery Cnty.*, 805 A.2d 372, 395 (Md. 2002). The Supreme Court of Maryland has recognized a special relationship exists between a State agency and a person or group where the State Legislature has clearly indicated an intent to create a duty owed by that agency to that person or group. *See Horridge v. St. Mary's Cnty. Dep't of Soc. Servs.*, 854 A.2d 1232, 1241–42 (Md. 2004). Here, HCLF has not cited any statute or rule that would support its contentions that it has some sort of "special relationship" with the State. ECF 25, at 12. Instead, it baldly asserts that the State owed it a special duty by virtue of "requiring participation in its payment system as a condition of serving Medicaid patients." *Id.* This is not sufficient to state a duty of care for a government entity providing benefits to the public at large.

### 2. Conversion

HCLF also brings its claim for conversion against the State as well as against United, on the basis that the State improperly collected on the debt. But for the same reasons the conversion claim fails as to United, it also fails against the State, as HCLF has failed to allege that the monies in question were kept segregated from other funds. *See Nash*, 2021 WL 1222874, at *8.

### 3. Title VII

Finally, Plaintiff brings a claim for violation of Title VII against the State. Title VII provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000(d). While the parties dispute whether HCLF can fairly be said to be a beneficiary of Maryland's federally funded Public Behavioral Health System, the Court finds that HCLF has failed to adequately allege that it was denied the benefits of that program on the basis of the racial

background of its owners. As discussed *supra*, HCLF does not offer facts sufficient to support the reasonable inference that United denied its payments because of the race of HCLF's owners. As such, it cannot say that it was "excluded from participation in, denied the benefits of, or subjected to discrimination" under a federally funded program. 42 U.S.C. § 2000(d).

## IV.    **CONCLUSION**

For the foregoing reasons, Defendants' motions to dismiss, ECFs 4 and 9, are GRANTED. A separate implementing Order will issue.

Dated: August 8, 2025                                                  /s/
                                                          Brendan A. Hurson
                                                          United States District Judge